UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | **Chapter 7** |
| **MICHAEL J. YANNI** | : | |
| | : | **Bankruptcy No. 05-10393ELF** |
| **Debtor** | : | |

| | | |
|---|---|---|
| **KELLY BEAUDIN STAPELTON** | : | |
| **United States Trustee for Region 3** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **Adversary No. 05-428ELF** |
| **MICHAEL J. YANNI** | : | |
| | : | |
| **Defendant** | : | |

# MEMORANDUM OPINION

**BY: ERIC L. FRANK, United States Bankruptcy Judge**

### I.

A bankruptcy discharge is a powerful legal right. In the right circumstances, it provides

an opportunity for an unfortunate debtor to climb up and out of the depth of debt to start life

anew without the albatross of financial stress. The discharge is the culmination of a successful

bankruptcy case. The exercise of this legal right comes with certain responsibilities. If a debtor

fails to meet those responsibilities, section 727(a) of the Bankruptcy Code provides for the denial

of a debtor's discharge. This is by far the most severe penalty a chapter 7 debtor can receive in

the life of a bankruptcy case. As one court stated, it is the "death sentence" of our venue. In re

Ryan 285 B.R. 624, 627-28 (Bankr. W.D. Pa. 2002). Therefore, application of section 727 must

be considered with great care.

Before me is an objection to discharge pursuant to 11 U.S.C. §727(a) filed by the United States Trustee ("UST"). The issue in this case is whether the court should sustain the UST's objection and deny the Debtor a discharge under either 11 U.S.C. §727(a)(3), for the failure to preserve adequate financial records, or 11 U.S.C. §727(a)(5), for the failure to provide a satisfactory explanation for a loss of assets.

As explained more fully below, I conclude that the UST's objection should be sustained. The Debtor will be denied a discharge.

## II.

The Debtor, Michael J. Yanni, is 38 years old and has a limited education. He has never lived on his own. The Debtor continues to reside in his parents' home with his mother and father. For most of his life, the Debtor has worked as a laborer. As a laborer, the Debtor digs trenches for cable, telecommunications and utility lines. Because the Debtor's work can only be done during the warmer months, he general collects unemployment compensation during the winter months. In the winter of 2003, the Debtor was laid off with the expectation he would be rehired in the spring of 2004. He was not. In 2004, his unemployment compensation benefits ran out, which caused him to resort to heavy credit card usage. In 2004, the Debtor made $26,573.69 worth of purchases and obtained $39,569.68 in cash advances on his various credit cards.

On January 10, 2005, the Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code in this court. At the time of filing, the Debtor was employed on a part-time basis as a laborer with a net-monthly income of $2,454.58. In his bankruptcy schedules, the

Debtor indicated that he owned no real property, had personal property with a value of $2,200,

which included a checking account valued at $100, and had no secured debt. However, on

Schedule F, the Debtor listed total unsecured debt in the amount of $112,670, all of which

constituted credit card debt.[1]

The UST subpoenaed the monthly credit statements of the Debtor for the period of

January 1, 2003 through January 1, 2005 from the following eight (8) credit card companies:

National City, Chase, Citibank, Discover, Bank One, Bank of America, American Express, and

MBNA America.

On June 22, 2005, the UST filed an adversary complaint objecting to discharge pursuant

to 11 U.S.C. §§727(a)(3) and (a)(5). On May 8, 2006, I held a trial after which both parties

submitted proposed findings of fact and conclusions of law. On July 14, 2006, the UST filed a

Motion for Leave to Reply to the Debtor's Proposed Findings of Fact and Conclusions of Law.

The UST attached her Reply as Exhibit "A" to her motion, which I granted on July 18, 2006.

Accordingly, in addition to consideration of both sides' proposed findings of fact and

---

[1] The Debtor's credit card debt is broken down as follows:

| | |
|---|---|
| American Express | .................................. $ 2,790.00 |
| Bank of America | .................................. $ 16,400.00 |
| Bank One | ............................................ $ 9,767.00 |
| Chase | ..................................................... $ 17,003.00 |
| Citi Cards | ............................................ $ 16,970.00 |
| Discover Card | ......................................... $ 8,090.00 |
| Macy's | .................................................... $ 513.00 |
| MBNA | ................................................. .$ 29,947.00 |
| National City | ........................................... $ 11,090.00 |
| | |
| TOTAL | ...................................................... $112,670.00 |

conclusions of law, I have also considered the UST's Reply.

## III.

"Congress described § 727's discharge provision as "'the heart of the fresh start provisions of the bankruptcy law.'" Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977)). "A denial of discharge imposes an extreme penalty and should not be taken lightly." In re Zofko, 344 B.R. 68, 74 (Bankr. W.D. Pa. 2006) (citing Rosen, 996 F.2d at 1531; In re Chalasani, 92 F.2d 1300, 1310 (2d Cir. 1996)). Section 727 must be construed liberally in favor of the debtor and against the party objecting to the discharge. Rosen, 996 F.2d at 1533.

11 U.S.C. §727(a) provides, in pertinent part, that the court shall grant the debtor a discharge, unless–

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transaction might be ascertained, unless such act or failure to act was justified under all of the circumstances;

> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

### A.    Section 727(a)(3) - Failure to Keep Adequate Records

#### 1.    Applicable Legal Principles

"The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtors's affairs and to test the completeness of the disclosure requisite to a discharge." Meridian Bank v. Alten, 958 F.2d 1226,

1230 (3d Cir. 1992) (citing 4 <u>Collier on Bankruptcy</u> ¶ 727.03[1] (15th ed. 1979)). It also ensures that "creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history." <u>Id.</u> at 1232.

To state a prima facie case under section 727(a)(3), a party objecting to the discharge must show (1) that the debtor failed to maintain and preserve adequate records and (2) this failure to maintain makes it impossible to ascertain the debtor's financial condition and material business transactions. <u>Id</u>. The objecting party must make an initial showing that the debtor's records are inadequate. <u>Id</u>. at 1233.

Once the objecting party meets the initial burden of showing that the records are insufficient to ascertain the debtor's financial condition, then the burden of coming forward shifts to the debtor to provide an explanation for the failure to keep adequate records. <u>Id.</u> at 1232-33; <u>In re Wasserman</u>, 332 B.R. 325, 331 (Bankr. N.D. Ill. 2005).

In this case, the Debtor does not dispute the UST's allegation factual presentation regarding the adequacy of his  records.  Rather, the Debtor argues that his failure to maintain adequate records was justified under the particular circumstances.


## 2.    **The UST's Burden**

Credit card statements are the types of documents that can give rise to a §727(a)(3) challenge. "While . . . credit card receipts or monthly statements may be simple records, they 'form the core' of what [is necessary] to ascertain [the Debtor's ] financial condition, primarily his use of cash assets." <u>In re Nemes</u>, 323 B.R. 316, 325 (Bankr. E.D.N.Y. 2005) (quoting <u>The</u>

-5-

Cadle Co. V. Terrell, 2002 WL 22075, at * 5 (N.D. Tex. Jan. 7, 2002), aff'd, 46 Fed. Appx. 731,

2002 WL 1973217 (5th Cir. July 30, 2002)).

In her Proposed Findings of Fact, the UST provided the following table listing the

Debtor's purchase and cash advance activity from 2003 to 2004 for the credit cards listed in his

schedules.  The Debtor does not dispute the figures on the UST's Table.

| Credit Card | 2003 Purchases | 2003 Cash Advances | 2004 Purchases | 2004 Cash Advances |
|---|---|---|---|---|
| Citi (Exhibit 3) | | | $4,835.76 | $ 3,161.50 |
| National City (Exhibit 4) | | | $ 501.90 | $ 550.00 |
| Bank of America (Exhibits 5-7) | $3,488.95 | $ 16,346.40 | $ 10,603.89 | $19,915.45 |
| Chase (Exhibits 8-9) | | | $ 200.24 | $ 1,923.25 |
| First USA (Exhibit 1) | | | $ 84.95 | $1,949.25 |
| Bank One (Exhibit 11) | | | $491.25 | $1,756.58 |
| MBNA (Exhibits 12-15) | $1,415.81 | $17,253.91 | $ 263.29 | $2,495.50 |
| Discover (Exhibit 16) | | | $ 6,596.54 | $6,931.40 |
| American Express (Exhibits 17-180 | $490.91 | $2,650.50 | $2,995.87 | $886.75 |
| **TOTAL** | **$ 5,365.67** | **$ 36,250.81** | **$ 26,573.69** | **$39,569.68** |

I find that the figures in the "purchases" columns of the UST's Table do not reflect the

-6-

actual **total** balance the Debtor incurred on the respective credit cards because the figures do not

include balance transfers. For instance, on the Citi and Bank of America credit cards, the UST's

Table states that the Debtor made $4,835.76 and $10,603.89 worth of purchases in 2004,

respectively. However, a review of the credit card statements submitted into evidence, from

which the UST comprised the Table, shows that the Debtor made seven (7) balance transfers to

his Citi credit card from January 2004 through May 2004 totaling $18,614.76 and four (4)

balance transfers to his Bank of America credit card in April 2004 totaling $7,805.[2] See Exhibits

---

[2] The Debtor made the following balance transfers to his Citi credit card:

January 26, 2004:

    $ 1,225.00 – from Bank of America
    $ 10,315.76 – from Bank One

May 5, 2004:

    $ 585.00 – from American Express
    $ 1,700.00 – from Bank of America
    $ 4,055.00 – from Discover

May 11, 2004:

    $ 300.00 – from Bank of America
    $ 434.00 – from Discover

The Debtor made the following balance transfers to his Bank of America credit card:

April 1, 2004

    $ 585.00 from Capital One
    $ 6,750.00 from Discover

April 3, 2004

    $ 110.00 from Peoples Bank

3 and 5.

I also note that the UST's Table does not provide the total amount of payments the

Debtor made on each credit card account. The Debtor suggests that the UST's statement of the

credit card use is not meaningful without reference to the payments made on the accounts. In his

Proposed Findings of Fact, the Debtor claims that he made a series of payments on each credit

card from December 31, 2002 through June 6, 2004 totaling $118, 684.74. The Debtor

specifically lists "payments" he made for all fifteen accounts. For instance, the Debtor claims

that he made the following payments on his Citi credit card:

| | |
|---|---|
| February 18, 2004 | $     240.00 |
| March 17, 2004 | $ 11,450.00 |
| April 5, 2004 | $      28.54 |

Similarly, the Debtor claims that he made the following payments on his Bank of

America credit card:

| | |
|---|---|
| May 7, 2003 | $ 11,900.00 |
| August 20, 2003 | $  1,170.00 |
| August 28, 2003 | $  1,260.00 |
| September 24, 2003 | $  4,700.00 |
| November 13, 2003 | $  7,850.00 |
| December 4, 2003 | $  1,820.00 |

I find the Debtor's statement in his Proposed Findings of Fact and Conclusions of Law

---

April 4, 2004

$   360.00 from American Express

In the interest of simplifying the analysis, based on the court's careful examination of the Citi
and Bank of America credit cards, the court concludes that each figure representing "purchases"
in the UST's Table does not include any balance transfers.

imprecise and unhelpful because many of the "payments" were actually balance transfers. For

instance, the "payment" the Debtor made in the amount of $11,450.00 on his Citi credit card was

an electronic payment made by way of a balance transfer to the Debtor's Bank One credit card.

See Exhibit 11. Likewise, **all** of the "payments" the Debtor claims to have made on the Bank of

America credit card are balance transfers to the Debtor's MBNA and First U.S.A. credit cards.

The Debtor acknowledged that he made the balance transfers to take advance of lower interest

rates. N.T. at 27-29.

The Debtor also made no effort to parse through the statements to explain precisely

which "payments" were made by the Debtor with cash and which "payments" were nothing

other than a transfer from one credit card to another. In his Reply to the Debtor's Proposed

Findings of Fact and Conclusions of Law, the UST categorized and labeled, based on what the

credit card statements provided, the alleged $118,684.74 in "payments" as follows:

| | |
|---|---|
| "Payments" | $ 26,946.58 |
| "Electronic Payments" | $ 69,287.00 |
| "Transfers" | $  4,553.90 |
| "Bill Payer Services" | $ 16,275.00 |
| "Miscellaneous" | $  1,622.26[3] |
| TOTAL | $118,684.74 |

I am not convinced that the entries labeled as "electronic payments," "transfers" or "bill

payer service" were actual payments made by the Debtor. At best, I can infer that the Debtor

made a total of $ 28,568.84 in payments to his various credit cards from December 31, 2002

---

[3] In her Reply, the UST did not quantify the "miscellaneous" category. Based on my
calculation of the values provided by the UST for the other categories, the difference remaining
was $1,622.26. Accordingly, I assigned that value to the remaining "miscellaneous" category.

through June 6, 2004. I reached this figure by adding the total amount of "payments," $ 26,946.58, to the total amount of "miscellaneous," $ 1,622.26. This figure is a far cry from the $118, 684.74 the Debtor alleges to have paid.

What is more troubling is the staggering amount of cash advances the Debtor received between 2003 and 2004. Based on the UST's Table, I calculate a total of $75,828.49 in cash advances. Considering the fact that the Debtor was unemployed most of the time during this period, I infer that most of the money used to make the $28,568.84 in the payments discussed above came from cash advances.[4] If I give the Debtor the benefit of the doubt and presume that the Debtor used cash advance money exclusively to make credit card payments, that presumption reduces the balance to $47,259.65, leaving the ultimate question: what happened to the remaining $47,259.65?

Since I am left wondering about the Debtor's disposition of $47,259.65 in cash advances, there is also some question in my mind whether the credit card statements obtained by the UST enable parties in interest to ascertain the Debtor's financial condition. Therefore, the UST may have met her initial burden, thereby shifting the burden to the Debtor to show that the failure to maintain adequate records was justified under the circumstances. Meridian Bank, 958 F.2d at 1233. However, as explained below, I need not make a definitive ruling on this question.

### 3.    The Debtor's Burden

---

[4] The Debtor had no records and could not identify the source(s) of the money he used to make payments to his various credit cards. He suggested that some money came from his father, and some were balance transfers. N.T. at 73-74.

-10-

The Bankruptcy Code does not state what constitutes justification for failure to maintain

records under §727(a)(3). The Third Circuit set forth parameters as to what constitutes proper

justification:

> The issue of justification depends largely on what a normal,
> reasonable person would do under similar circumstances. The
> inquiry should include the education, experience, and
> sophistication of the debtor; the volume of the debtor's business;
> the complexity of the debtor's business; the amount of credit
> extended to debtor in his business; and any other circumstances
> that should be considered in the interest of justice.

Meridian Bank, 958 F.2d at 1231.

The determination of what is a justifiable explanation for the failure to keep records is an

analysis based on the facts and circumstances of the particular case. In re Wasserman, 332 B.R.

at 331 (quoting In re Self, 32 B.R. 224, 241 (Bankr. N.D. Ill. 2005) ("Whether a debtor's books

and records are complete and accurate is to be determined on a case-by-case basis, considering

the size and complexity of the debtor's financial situation, as well as 'the sophistication of the

debtor, his educational background, his business experience and acumen, and his personal

financial structure.'")); In re Devaul, 318 B.R. 824, 837 (Bankr. N.D. Ohio 2004) (same)

(surveying cases where courts have rejected and accepted justifications advanced under

§727(a)(3)).

As explained in Meridian Bank, record keeping activities differ depending upon the

sophistication and business activities of the debtor:

> **Depending upon the sophistication of the debtor and the extent**
> **of his activities, different record keeping practices are**
> **necessary.** *See, e.g., Goff v. Russell Co.,* 495 F.2d 199, 201-02

(5th Cir.1974) ("Obviously an unsophisticated wage earner dealing primarily in cash should not be denied a discharge because he failed to keep books of account. A higher standard of care is required, however, for a merchant actively engaged in credit transactions."). . . . Attorneys and other professionals may be held to the standard of care ordinarily exercised by members of their profession. What will justify failure depends largely upon how extensive and complicated the bankruptcy business is . . . . **Honesty is not enough; the law demands as the condition of a discharge either that the bankrupt shall produce such records as are customarily kept by a person doing the same kind of business, or that he shall satisfy the bankruptcy court with adequate reasons why he was not in duty bound to keep them.**

Meridian Bank at 1231-1232 (emphasis added) (citation omitted).

Assuming arguendo that the UST met her burden of establishing the inadequacy of the Debtor's records under §727(a)(3), the evidence in this case suggests one primary justification for the Debtor's inadequate record keeping: the Debtor is relatively unsophisticated and uneducated. He dropped out of high school in the tenth grade, though he ultimately received his GED. With the exception of intermittent bouts of family discord when the Debtor opted to stay in a hotel in lieu of his parents' house, the Debtor has lived with his parents his entire life. The Debtor has never had a stable income because he has lacked steady employment. He has worked sporadically as a laborer and in the three years prior to filing bankruptcy, the Debtor's income level dramatically fluctuated: 2002- $4,507; 2003- $24,000; and 2004- $12,514. N.T. at 16-17. Generally, the Debtor retained his credit card statements for no longer than one or two months and then discarded them. N.T. at 26; 64. In short, the Debtor's education, work history and life experience provided him with a limited ability to account for his expenses.

Courts have accepted a debtor's unsophistication and lack of education as justification for a debtor's failure to keep records. See, e.g., In re Sendecky, 283 B.R. 760, 764 (8th Cir. BAP

-12-

2002); In re Devaul, 318 B.R. 824, 840 (Bankr. N.D. Ohio 2004); In re Luhman, 146 B.R. 163,

165 (Bankr. W.D. 1992); In re Zell, 108 B.R. 615, 627-28 (Bankr. S.D. Ohio 1989); In re

Haugen, 9 B.R. 4, 5 (Bankr. S.D. Fla. 1980).

I have worked through the §727(a)(3) analysis to this point because it sets the stage for

and facilitates my discussion of the reasons why I must deny the Debtor's discharge under

§727(a)(5).  Since I am basing my decision on §727(a)(5), I need not decide whether the UST or

the Debtor met their respective burdens under §727(a)(3) .

**B.      Section 727(a)(5) - Loss of Assets**

1.      <u>**Applicable Legal Principles**</u>

Section 727(a)(5) provides that a discharge will be granted unless the debtor fails to

satisfactorily explain any loss of assets to meet the debtor's liabilities.  A bankruptcy judge has

"broad power to decline to grant a discharge where the debtor does not adequately explain a

shortage, loss or disappearance of assets." In re Wasserman, 332 B.R. at 333 (citations omitted).

Similar to section 727(a)(3), the analysis under §727(a)(5) uses a burden shifting

framework.  In re Sendecky, 283 B.R. 760, 766 (8th Cir. BAP 2002).  The objecting party must

first make a showing that the debtor "at one time owned substantial and identifiable assets that

are no longer available to his creditors." In re Wasserman, 332 B.R. at 333.  Once that burden

has been satisfied, it shifts to the debtor to offer a "satisfactory explanation" for the unavailable

assets. Id.

-13-

However, unlike §727(a)(3), the plain language of §727(a)(5) makes clear that the debtor cannot offer a justification for the failure to satisfactorily explain the loss of assets. In re Mezvinsky, 265 B.R. 681, 689 (Bankr. E.D. Pa. 2001) (citing In re Buzzelli, 246 B.R. 75, 118 Bankr. W.D Pa. 2000)). The Debtor may have the responsibility to produce documentation to explain the loss. As explained by the Mezvinsky court:

> [A] debtor facing an objection to discharge under § 727(a)(5) may very well have to gather or produce documents and records which she might otherwise not ordinarily keep and in fact may be justified for failing to keep under § 727(a)(3). She may well have to hire professionals to locate her assets if she is unable to do so herself.

Mezvinsky, 265 B.R. 690-91 (citations omitted). See also In re Wasserman, 332 B.R. at 334 (stating that the debtor's explanation must have two criteria to be "satisfactory": (1) it must be supported by documentation; and (2) the documentation must be sufficient so the court need not speculate as to what happened to the assets). Some courts believe that documentation may not be necessary, however. In re Cacioli, 2006 WL 2588038, — F.3d — (2d. Cir. Sept. 6, 2006) ("As long as the debtor's explanation is convincing and not rebutted, there is no need for documentary corroboration.").

It is entirely within the court's discretion to determine what constitutes a "satisfactory" explanation for the loss of assets. Mezvinsky, 265 B.R. at 689. Courts in this circuit have held that the explanation must "convince the judge" that the explanation is worthy of belief. Id. (citations omitted). The court should not bother itself with the propriety of the disposition of the assets, but only whether the explanation is satisfactory. Id. At minimum, a satisfactory explanation must consist of more than vague, indefinite, and uncorroborated assertions. In re

-14-

Sendecky, 283 B.R. 760, 766 (8th Cir. BAP 2002); In re Shepherd, 2005 WL 4147868, at *3

(Bankr. D. Kan Oct. 7, 2005). "The explanation must appear reasonable such that the court no

longer wonders what happened to the assets." Shepherd, 2005 WL 4147868, at *3 (citation

omitted).

As the movant, the UST bears the initial burden of production to establish by a

preponderance of the evidence that the Debtor had a "cognizable interest in specific identifiable

property at a time not too far removed from the bankruptcy which [he] no longer possess." In re

Mezvinsky, 265 B.R. at 689. All the UST needs to do is identify the lost assets. She need not

show the Debtor acted knowingly or fraudulently. Ryan, 285 B.R. at 632. See also Mezvinsky,

265 B.R. at 690 ("727(a)(5) includes no subjective element of proving wrongful scienter such as

intent to default or hinder creditors.").


2.    **Discussion**

I believe that the question I posed earlier – what exactly happened to the remaining

$47,259.65 of "hard cash" that flowed through the Debtor's hands – goes directly to the analysis

under section 727(a)(5). See In re Shepherd, 2005 WL 4147868, at * 2-3 (cash advances

obtained on various credit cards constituted an asset that would have belonged in the bankruptcy

estate for purposes of an analysis under §727(a)(5)). The UST has shown that the Debtor

acquired $75,828.49 from cash advances during 2003 and 2004. For purposes of the analysis

under §727(a)(5), however, I will deem $ 28,568.84 of that cash to have been used by the Debtor

to make payments toward his credit card balances. The remaining balance, $47,259.65,

constitutes the identifiable asset loss in question. Therefore, the UST has put forth sufficient

-15-

evidence to meet her initial burden.

The Debtor now bears the burden of providing a satisfactory explanation for the loss of

$47,259.65. The Debtor's response is that he generally spent the cash on "everyday living

expenses and debts, resulting in no valuable assets." See Debtor's Proposed Findings of Fact and

Conclusions of Law at ¶ 28. During the hearing, the Debtor testified that his living expenses

comprised of the following: (1) rent/household expenses; (2) food; (3) credit card payments; (4)

gas; (5) car insurance; (6) car payment; and (7) cell phone. N.T. at 81-84.

First, I must eliminate the credit card payment expense from this analysis because I

already addressed that expense. Next, as to the Debtor's rent/household expenses, I am mindful

that the Debtor had a rather erratic stream of income due to periodic unemployment. Although

he reported in his schedules that he had a rent payment of $500, the Debtor testified that the

amount of his household expenses, including rent, directly correlated with whether he was

employed. N.T. at 18-19. In other words, the more he worked, the more he contributed to the

household expenses; the less he worked, the less he contributed. N.T. at 18. From this testimony

I infer that the Debtor contributed close to nothing when he was unemployed, particularly when

his unemployment compensation ceased in the Spring of 2004.[5] However, I conclude that

because the Debtor did not provide even a rough estimate of what he likely contributed to the

household, I cannot apply an average monthly household expense to this analysis.[6]

_____

[5] I will accept that the Debtor put his bi-weekly unemployment check of $237 toward
some of these expenses, when possible.

[6] In 2004, the Debtor testified that he was out of work for eight months. Presumably, his
household expenses were minimal at this time.

-16-

The Debtor was able to pin down the value of certain fixed expenses he maintained regardless of his employment status. Each month the Debtor spent approximately a total of $812 on his (1) car payment – $312/month; (2) car insurance – $350/month; and (3) cell phone – $150/month. Consequently, I will find that in 2003 and 2004, the Debtor spent $19,488, or $812 for twenty-four (24) months, on fixed expenses – his car payment, car insurance and cell phone bill.

When I subtract $19,488 from the $47,259.65 of unaccounted for cash advances, I am still left with $27,771.65 in unaccounted for cash from the original total cash advance balance of $75,828.49. This remaining figure must be considered with the $31,939.36 worth of purchases the Debtor made within the two years of filing his petition. That total figure amounts to $59,711.01, and averages to approximately $2,500 per month of spending beyond the fixed expenses previously discussed.

As to the $31,939.36 in purchases, the majority of the items the Debtor bought were consumable goods and services, for which he provided an explanation at the hearing. For instance, the Debtor identified a few jewelry purchases, including an engagement ring and a bracelet for his then-girlfriend. Those items remain in her possession. N.T. at 30, 81. The Debtor also spent $990 on baseball tickets. He explained that he advanced the money to his brother and believed that he was going to be reimbursed, but never was. N.T. at 47. In addition, the Debtor explained that the several hotel charges he incurred were for instances when he needed to stay out of the house as a result of family strife. N.T. at 55. However, there was at least $2,500 spent on a series of purchases made at an establishment called "M&E, Inc." in April and May of 2004 for which the Debtor could not provide an explanation. N.T. at 50, 62; see also Exhibit 7.

-17-

The Debtor suggests that the majority of the $27,771.65 went to food, gasoline and other miscellaneous living expenses, I find this implausible based on the Debtor's testimony and the credit card statements submitted into evidence. The Debtor regularly charged meals and entertainment expenses that were, admittedly, lavish at times. For instance, the Debtor went to the restaurant T.G.I. Fridays two times on the same day, October 1, 2003, and charged $46.06 and $37.59. See Exhibit 5. The Debtor also went to a high-end Philadelphia restaurant, Cuba Libre, on consecutive days, May 12 and 13, 2004, and charged $139.40 and $133.20. See Exhibit 3. The Debtor also regularly purchased gasoline on his credit card. For example, the Debtor made purchases at gasoline stations for $4.84 on April 13, 2004, $ 13.43 on April 14, 2004, and $8.10 on April 17, 2004. See Exhibits 4 and 7. While I can imagine there must have been some instances when the Debtor used cash, instead of a credit card to pay for less extravagant food items, entertainment or gas purchases, I am less comfortable with that notion when I see several small charges such as $11.50 at Rookies Restaurant on September 25, 2003, and Wawa convenience store purchases of $5.64 and $1.05 on October 16 and 17, 2003. See Exhibit 5. I find that the Debtor used his credit cards to charge purchases for food and gasoline whenever it was possible.

I have combed the record and given the Debtor the benefit of the doubt to determine whether he has met his burden of proof. Even with some of the more extravagant spending accounted for by credit card entries, I am still puzzled as to what happened to the remaining $27,771.65. I am particularly troubled by the Debtor's responses when the UST asked about an extraordinary amount of cash he withdrew within a particular two month period. During April and May 2004, the Debtor took cash advances on six of his credit cards totaling approximately

$15,094.[7] The Debtor testified that he was experiencing family turmoil during the spring of
2004 and needed to pitch in to assist his family.  Other than speculating that he may have
contributed to the cable, water electric bills – bills which were likely to have been modest in
amount – he could not explain the need for so much cash within that specific time period.[8]

Similarly, when the UST brought to the Debtor's attention that he withdrew
approximately $1,500 in three days in November 2003, $2,500 between February 11 through
February 18, 2004, and $1,300 between March 6 through 16, 2004, the Debtor had no

explanation. The Debtor also indicated that he was addicted to pain medication and sought
rehabilitative treatment in February, September and October of 2004. But, when asked whether

---

[7] The Debtor made the following charges between April and May 2004.

| Citi | $ 3,100.00 - May 11th and 12th | See Exhibit 3. |
| National City | $   550.00 - April 19th and 28th | See Exhibit 4. |
| Bank of America | $ 2,380.75 - April 22nd - May 14th | See Exhibit 7. |
| Chase | $ 1,923.25 - April 12th -20th | See Exhibit 9. |
| Discover | $ 4,340.00 - April 21st - May 19th | See Exhibit 16. |
| American Express | $ 2,800.00 - May 2004 | See Exhibit 18. |
| **TOTAL** | **$15,094.00** | |

[8] Based on the testimony, it seems that the spring of 2004 was a critical period for the
Debtor. In short, he weathered the "perfect-storm." In or around April 2004, the Debtor's
unemployment compensation benefits ceased. N.T. at 67.  At the same time, his parents also
were experiencing financial difficulty, presumably due to the fact that the Debtor's mother had
two strokes- one in April and another in May. N.T. at 83-85.  In addition, the Debtor's aunt died
of cancer and the Debtor's grandmother was trying to find a place to live.  N.T. at 87-88.  Had
the record been more fully developed, I may have concluded that this storm of events contributed
to the surge in Mr. Yanni's need for cash. However, the Debtor did not explain with sufficient
specificity how he spent the extra cash during this critical period.  He did not retrace any of the
remaining $15,094.00 back to some event or circumstance.  Although my hunch is that the
remaining unaccounted for cash was not concealed or hidden from the creditors, I am forced to
speculate as to what actually happened to that large sum of cash.  This is simply not enough to
meet the standard under §727(a)(5).

he might have used cash advance money to pay for treatment, he explained that his treatment was covered by his health benefits, or he received assistance from his mother. N.T. at 67-68.

What troubles me in this case is the inadequacy of the Debtor's explanation. He consistently testified that he just did not remember what happened to the money. Because he rarely put money into a checking account, even when he was working, he had no recollection of where it went. Section 727 puts some onus on the Debtor to retrace his steps and put some of the puzzle pieces back together. "It is not the Court's duty to act as sleuth, ferreting through a debtor's books and records in an attempt to trace the loss of assets or reconstruct the debtor's financial history." Spirk v. Sullivan, 2003 WL 22048077, at *5 (N.D. Ill. Aug. 28, 2003). Once the UST made out its prima facie case, it became the Debtor's burden to come up with a discernable explanation for the excessive amount of cash advances. The bottom line is, he has not done so. I must deny the discharge on that basis.

An order consistent with this Memorandum Opinion shall follow.

Dated: October 30, 2006

**ERIC L. FRANK**
**United States Bankruptcy Judge**

-20-

**UNITED STATES BANKRUPTCY COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re** | : | **Chapter 7** |
| **MICHAEL J. YANNI** | : | |
| | : | **Bankruptcy No. 05-10393 ELF** |
| **Debtor** | : | |

| | | |
|---|---|---|
| **KELLY BEAUDIN STAPELTON** | : | |
| **United States Trustee for Region 3** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **Adversary No. 05-428ELF** |
| **MICHAEL J. YANNI** | : | |
| | : | |
| **Defendant** | : | |

**ORDER**

**AND NOW,** upon consideration of the United States Trustee's objection to discharge under 11 U.S.C. §§727(a)(3) and (a)(5), the Debtor's response thereto, after a trial and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby **ORDERED** that the Objection is **SUSTAINED**. The Debtor's discharge is **DENIED**.

Dated: October 30, 2006

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**